United States District Court
Southern District of Texas
**ENTERED**
March 16, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DANTE TRICE, ET AL., | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:19–CV–00286 |
| | § | |
| PEARLAND INDEPENDENT | § | |
| SCHOOL DISTRICT, ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

There are four motions to dismiss pending before me: (1) Defendant Tony Barcelona's Motion to Dismiss (Dkt. 16); (2) Defendant Helen Day's Motion to Dismiss (Dkt. 17); (3) Defendant Jeanette Peterson's Motion to Dismiss (Dkt. 18); and (4) Defendant Pearland Independent School District's Motion to Dismiss (Dkt. 19).[1]  Having considered the Motions to Dismiss, responsive briefing, oral argument, applicable law, and the record, I recommend that the Motions to Dismiss be **GRANTED in part and DENIED in part** as described below.

---

[1] I collectively refer to all four motions as "Motions to Dismiss."

## BACKGROUND[2]

On April 17, 2019, J.T., an African American seventh grader at Berry Miller Junior High School in Pearland Independent School District ("Pearland ISD") went to school with a new haircut: a fade with design line, which is extremely common among African Americans.  He probably expected his day to go on without incident, except perhaps maybe a few looks of approval from his peers due to his fresh haircut.  *See, e.g.,* DERRICK D. BARNES, CROWN: AN ODE TO THE FRESH CUT (Denene Millner Books 2017).  But that is not what happened.

While J.T. was in the cafeteria for breakfast, Assistant Principal Tony Barcelona ("Principal Barcelona") told J.T. that he was not in compliance with the dress code and sent him to the office.  J.T. waited in the office for a short time before Principal Barcelona arrived and instructed him to go to the office of Discipline Clerk Helen Day ("Discipline Clerk Day").  J.T. immediately went to Discipline Clerk Day's office.  Discipline Clerk Day informed J.T. that his new haircut violated the school's dress code regarding hairstyles, which at the time, in pertinent part, provided: "Extreme hair styles such as carvings, mohawks, spikes, etc. are not allowed."  Dkt. 14 at 9.

With the alleged violation on the table, Principal Barcelona came into Discipline Clerk Day's office and gave J.T. two disciplinary options: (1) be assigned to in-school

---

[2] The facts in this section are taken from Plaintiffs' 1st Amended Original Complaint for Declaratory Judgment, Injunctive Relief, and Damages ("Amended Complaint").  At this stage in the proceedings, I must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff."  *Cummings v. Premier Rehab Keller, PLLC*, 948 F.3d 673, 675 (5th Cir. 2020) (quotation marks and citation omitted).

suspension for an indeterminate length of time; or (2) color in his hair's design line.[3]  J.T. was not informed of any other disciplinary options, and neither of his parents were contacted.  Fearing the likely fallout that would accompany his suspension—i.e., parental anger, potentially being kicked off the track team, and the first blemish on his then spotless school record—"J.T. under great duress, indicated that of the only two options to be immediately implemented it would be the coloring in of his hair design."  *Id.* at 5.

What happened next defies all logic, commonsense, and, in my estimation, common decency:[4]  To complete the coloring in of the design line, Discipline Clerk Day, acting with Principal Barcelona's oversight, handed J.T. "a jet-black Sharpie permanent marker," which "contains many hazardous chemicals and . . . [is] '[n]ot for use on skin.'"  *Id.* (citation and emphasis omitted).  Thereafter, Principal Barcelona and Discipline Clerk Day oversaw J.T. as he attempted to color in his design line with the Sharpie.  After a short time, Discipline Clerk Day took the Sharpie from J.T. and started coloring his scalp without his consent.  While Discipline Clerk Day continued coloring, Jeanette Peterson ("Peterson"), a teacher, came into Discipline Clerk Day's office.  Discipline Clerk Day asked Peterson to finish coloring J.T.'s scalp with the Sharpie.  Again, without J.T.'s consent, Peterson began coloring J.T.'s scalp with the Sharpie.  According to J.T., during the coloring of his scalp, Principal Barcelona, Discipline Clerk Day, and Petersen—all of

---

[3] To be clear, a design line is essentially a part in the hair.  Thus, to "color in" J.T.'s design line, a coloring agent would have to be applied directly to his scalp.

[4] I recognize that Defendants dispute many of J.T.'s factual allegations.  However, there is no dispute that J.T.'s scalp was in fact colored with a Sharpie.  To the extent that I express any criticism in this opinion, it is related to this unfortunate, undisputed fact.

whom are white—"were laughing at what was happening."[5]  *Id.* at 6.  Meanwhile, J.T. was

left "very frightened" by their conduct.  *Id.*

In the end, J.T. was left to parade around the school all day with a contemporary

scarlet letter emblazoned on his head:



*Id.* at 7.   J.T.'s blackened scalp became the topic of conversation around the school,

resulting in unflattering comments from some peers and negative social media posts with

---

[5] In the Amended Complaint, J.T. brings light to several facts that touch on racial discrimination towards African Americans.  First, he draws a parallel between the Individual Defendants, all of whom are white, coloring his scalp with a jet black Sharpie and the fact that "[d]uring the Jim Crow era slaves were often depicted as happy in their slave existence and with jet-black skin as a means to disguise their humanity and imply that they are unlike 'white' people."  Dkt. 14 at 5. Next, he quotes a Pearland ISD board member who, in some unspecified forum and context, acknowledged that "[i]t's no secret that *racism, whether intentional or not, has crept into the code*."  *Id.* at 9.  Lastly, he points to a 2015 study by the United States Department of Justice Office for Civil Rights, which found that although there are twice as many white students in Pearland ISD, white students and African American students "made up equal portions of students who received In-School Suspensions," meaning "African American students were suspended 143% *more* often than whites."  *Id.* at 9–10.  I acknowledge J.T.'s submission of these facts.  However, J.T. has not offered any argument or allegations linking these facts with Defendants' conduct in this case.  Thus, these facts simply have no bearing on my analysis.

memes.  And "J.T. felt extremely degraded and suffered at least great embarrassment, shame, anxiety and depression."  *Id.*  J.T. ultimately had to scrub his head very intensely to remove the Sharpie ink.

As a result of the stupid decision to color J.T.'s scalp with a Sharpie, J.T. and his parents, Dante Trice ("Trice") and Angela Washington ("Washington") (collectively, "Plaintiffs"),[6] filed this lawsuit against Pearland ISD, Principal Barcelona, Discipline Clerk Day, and Petersen (collectively, "Defendants").[7]  Under Texas state law, J.T. first brings an assault claim.  Under 42 U.S.C. § 1983, Plaintiffs assert claims pursuant to the Fourth Amendment (excessive force), Fifth Amendment (due process), Fourteenth Amendment (due process and equal protection), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (race discrimination).  Lastly, Plaintiffs assert a race discrimination claim under 42 U.S.C. § 1985.[8]

---

[6] Trice and Washington have filed suit in their individual capacities, in addition to on behalf of their minor son, J.T.  In the interest of clarity, where my discussion of a claim focuses on Trice's and Washington's claims in their representative capacity, I refer directly to J.T.  In this manner, I intend to clearly distinguish J.T.'s claims and his parents' individual capacity claims.

[7] When necessary to exclude Pearland ISD, I refer to Principal Barcelona, Discipline Clerk Day, and Peterson collectively as "the Individual Defendants."

[8] In his response to Defendants' Motions to Dismiss, J.T. claims for the first time that Defendants have violated his freedom of expression under the First Amendment.  Specifically, he describes his haircut as a form of expression.  I have reviewed the Amended Complaint and find no comparable allegation.  Indeed, the Amended Complaint does not contain any allegation that should have put Defendants on notice that one of his claims related to the denial of his freedom of expression.  In fact, J.T. does not even use the word "expression" in the Amended Complaint. "[I]t is wholly inappropriate to use a response to a motion to dismiss to essentially raise a new claim for the first time."  *Diamond Beach Owners Ass'n v. Stuart Dean Co.*, No. 3:18-CV-00173, 2018 WL 7291722, at *4 (S.D. Tex. Dec. 21, 2018).  That said, some courts "interpret[] a new theory raised in a response to a motion to dismiss as a motion to amend the complaint."  *Cantu v. Fed. Home Loan Mortg. Corp.*, No. CV M-12-103, 2012 WL 13054833, at *1 (S.D. Tex. Sept. 17, 2012).  In this case, I would not grant such a request to amend the complaint yet again because J.T. has already been afforded the opportunity to amend his pleading once, and I have already

Defendants have moved to dismiss this suit on several overlapping grounds.  I will address their arguments below.

## RULE 12(b)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  In evaluating a motion to dismiss, I must view the well-pleaded facts in the light most favorable to the plaintiff.  *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).  In assessing the sufficiency of the complaint, I must limit my review "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.) v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## DISCUSSION

A.  STANDING

Defendants each move to dismiss the claims brought by Trice and Washington, contending that J.T.'s parents lack standing to proceed in their individual capacities.

---

denied the motion to further amend his complaint.  Accordingly, I need not rule on J.T.'s purported First Amendment claim because no such claim is before me.

Defendants argue that Trice and Washington have not alleged that they have suffered a concrete injury separate from J.T.'s alleged injuries.  In other words, Defendants contend that J.T.'s parents cannot state a claim based on injuries allegedly suffered solely by their son.  In response, Trice and Washington contend that they "have alleged facts sufficient to bring 42 U.S.C. [§] 1983 claims against all Defendants" because they need only "prove some violation of their personal rights."  Dkt. 20 at 18 (quotation marks and citation omitted).  Specifically, citing *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925), Trice and Washington argue that Defendants' conduct surrounding the coloring of J.T.'s scalp affected their "liberty to direct the upbringing and education of children under their control."  Dkt. 20 at 18 (quotation marks and citation omitted).

To establish standing under Article III, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

In my review of the Amended Complaint, I find no factual basis for me to infer that Trice and Washington suffered an injury in fact.  Indeed, I can find no allegations that even place this case in the realm of the parental liberty interest at issue in *Pierce*.  In *Pierce*, the Court held that a state law compelling children between the ages of eight and sixteen to attend public school up through the eighth grade was unconstitutional because it

"unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control."  268 U.S. at 534–35.  No such restriction on Trice's and Washington's educational choice is at issue here, so *Pierce* provides them no cover on the issue of standing.  The alleged facts make plain that Trice and Washington seek to vindicate the purported violation of their son's constitutional rights.  This fact dooms their claim because "[i]t is well-established that parents lack standing to bring individual claims under § 1983 based solely upon deprivation of a child's constitutional rights."  *Crozier v. Westside Cmty. Sch. Dist.*, No. 8:18CV438, 2018 WL 5298744, at *2 (D. Neb. Oct. 25, 2018) (internal quotation marks and citation omitted) (collecting cases).  Consequently, Trice and Washington must be dismissed in their individual capacities for lack of standing.  Thus, moving forward, Trice and Washington should only remain in their representative capacities as J.T.'s parents.

B.  ASSAULT

Pearland ISD and the Individual Defendants move to dismiss J.T.'s assault claim, advancing arguments predicated on their understanding that J.T. alleged the claim against all defendants.  At the hearing on the Motions to Dismiss, J.T. disputed this factual predicate, arguing that he alleged the assault claim against the Individual Defendants only.  Whether J.T. sued only the Individual Defendants or all defendants is critical to my analysis.  Thus, I will first resolve this issue, and then I will explore how my determination impacts Defendants' specific legal arguments.

In arguing that J.T. sued all defendants for assault, Defendants point to a single sentence in the assault section of the Amended Complaint: "Defendants did not act in good

faith as they knew their actions were not legal." Dkt. 14 at 11. Defendants argue because the sentence uses the word "Defendants," which is plural, J.T.'s allegation is made against all defendants. Defendants also argue that they put J.T. on notice about their understanding of his allegation when they filed pre-motion letters seeking leave to file motions to dismiss. They point out that in response to those letters, J.T. filed the Amended Complaint and neglected to make any changes to the assault section. They argue that this fact creates negative inferences that should weigh against interpreting the assault claim as against only the Individual Defendants.

At the hearing on the Motions to Dismiss, J.T. directed my attention to the Amended Complaint. He pointed out that the single sentence relied upon by Defendants is the only sentence in the assault section of the Amended Complaint that uses the word "Defendants." J.T. argued that I must read this specific sentence in context with the sentence immediately preceding it. I have done so, and I find J.T.'s position persuasive.

The sentence immediately preceding J.T.'s lone reference to "Defendants" concerns a state actor's ability to assert official immunity once sued in his individual capacity: "State actors have official immunity while performing discretionary duties within the scope of their authority, so long as they act in good faith." *Id.* The sentence— "Defendants did not act in good faith as they knew their actions were not legal"—seems to mimic the preceding sentence concerning official immunity. *Id.* In my view, this is a critical observation because official immunity could only apply to school employees, not the school district. This implies that J.T.'s assault claim is asserted against only the Individual Defendants.

Furthermore, I think that the lone reference to "Defendants" is ambiguous, at best. The word "Defendants" can be read to mean "all defendants," but it can also be read to simply mean "more than one defendant." The first option includes Pearland ISD. The second option could include any combination of two or more of the Defendants—i.e., it may include or exclude Pearland ISD. Further muddying the water, the Amended Complaint contains at least one other reference to "Defendants" that clearly does not mean "all defendants." In Paragraph 62, J.T. states: "Pearland ISD failed to train its employees including *Defendants* in what constituted a dress code violation hairstyle . . . ." *Id.* at 13 (emphasis added). In this sentence, "Defendants" clearly refers to Pearland ISD's employees, excluding Pearland ISD. Considering these ambiguities, J.T.'s argument about context is particularly compelling.

Given that at this motion to dismiss stage I must view the well-pleaded facts in the light most favorable to the plaintiff, I find that J.T. has sued only the Individual Defendants for assault.[9] I now turn to Pearland ISD's legal arguments.

Assuming that J.T. alleged his assault claim against all defendants, Pearland ISD moves to dismiss the assault claim against itself and the Individual Defendants. On its own behalf, Pearland ISD argues that sovereign immunity requires its dismissal. On behalf of the Individual Defendants, Pearland ISD argues because J.T.'s assault claim is brought against it and the Individual Defendants, the assault claim against the Individual

---

[9] I decline Defendants' invitation to apply negative inferences to J.T.'s assault allegations based on his failure to amend the assault section. In my view, J.T.'s interpretation of his allegations is reasonable, and the mere fact that Defendants disagreed and filed pre-motion letters did not obligate him to amend his allegations.

Defendants must be dismissed pursuant to Section 101.106(e) of the Texas Civil Practice & Remedies Code (a/k/a the Texas Tort Claims Act or "TTCA").[10]   Because I've found that J.T. has only sued the Individual Defendants for assault, Pearland ISD's argument concerning its own immunity is superfluous; no such claim has been asserted against Pearland ISD.  Thus, I will focus on Pearland ISD's argument concerning the Individual Defendants.

Section 101.106(e) of the TTCA provides: "If a suit is filed under this chapter *against both a governmental unit and any of its employees*, the employees shall immediately be dismissed on the filing of a motion by the governmental unit."  TEX. CIV. PRAC. & REM. CODE § 101.106(e) (emphasis added).  Section 101.106(e) only applies where a plaintiff files claims against the government and its individual employees.  *See Green v. Nueces Cty.*, No. C–09–316, 2010 WL 918972, at *5 (S.D. Tex. Mar.15, 2010) (citing *Kelemen v. Elliot*, 260 S.W.3d 518, 523 (Tex. App.—Houston [1st Dist.] 2008, no pet.)).  Because I have determined that J.T. has not alleged his assault claim against both Pearland ISD and the Individual Defendants, Section 101.106(e) of the TTCA does not

---

[10] The Individual Defendants move to dismiss on this same ground.  *See* Dkts. 16 at 7–8, 17 at 7–9, 18 at 7–9.  However, the statute makes plain that relief under Section 101.106(e) is predicated on "*the filing of a motion by the governmental unit*."  TEX. CIV. PRAC. & REM. CODE § 101.106(e) (emphasis added).  Thus, the Individual Defendants' request is immaterial because only Pearland ISD's motion can invoke Section 101.106(e).  *See Hernandez v. City of Lubbock*, 253 S.W.3d 750, 755 (Tex. App.—Amarillo 2007, no pet.) ("We see nothing in . . . section 101.106(e) to provide for dismissal of an employee on the motion of any but the governmental unit defendant.").

11

apply in this case. *See id.* Consequently, J.T.'s assault claim against the Individual Defendants should survive for the time being.[11]

## C. SECTION 1983 CLAIMS

### 1. Fourth Amendment – Excessive Force

J.T. has sued the Individual Defendants for excessive force under the Fourth Amendment. *See* Dkt. 14 at 12. The Individual Defendants move to dismiss this claim, arguing that the Fifth Circuit does not recognize excessive force claims in educational disciplinary settings. The Individual Defendants cite *Flores v. School Bd. of DeSoto Parish*, 116 F. App'x 504 (5th Cir. 2004) in support of their argument.

In *Flores*, a special education student and his mother sued various school-related agencies for excessive force and unlawful seizure in violation of the Fourth Amendment

---

[11] In their respective motions, the Individual Defendants have not explicitly moved to dismiss J.T.'s assault claim on any ground other than Section 101.106(e) of the TTCA. That said, Discipline Clerk Day and Peterson both cite *Texas Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 357 (Tex. 2013) with a parenthetical stating: "[H]olding that claims based on conduct within the scope of employment is not a suit against the employee; it is in all but name only, a suit against the government unit." Dkts. 17 at 8 (internal quotation marks omitted), 18 at 8 (internal quotation marks omitted). This parenthetical seems to invoke Section 101.106(f) of the TTCA, which "provides a governmental employee with statutory immunity from suit when he or she is sued for a tort that '(1) is based on conduct within the general scope of the employee's employment and (2) could have been brought under the Act against the governmental unit.'" *Gomez v. Massey*, No. 3:18-CV-00348, 2019 WL 4034319, at *2 (S.D. Tex. Aug. 27, 2019) (quoting *Garza v. Harrison*, 574 S.W.3d 389, 399–400 (Tex. 2019)). Arguably, this provision may apply in this case—at oral argument, at least one of the attorneys mentioned Section 101.106(f). However, because the Individual Defendants have not explicitly moved on this ground, they have not sufficiently asserted their entitlement to such relief, and I decline to *sua sponte* reach the issue. *See Fryday v. Michaelski*, 541 S.W.3d 345, 349 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (explaining that an "individual defendant is entitled to dismissal *upon proof*" that Section 101.106(f) of the TTCA is applicable) (emphasis added).

after an incident in which a teacher allegedly threw the student against the wall, placed his hands around the student's neck, and choked him while threatening bodily harm. *See Id.* at 506. The Fifth Circuit declined to recognize the Fourth Amendment claim, explaining that "permitting students to bring excessive force claims under the Fourth Amendment would eviscerate this circuit's rule against prohibiting substantive due process claims on the part of schoolchildren for excessive corporal punishment." *Id.* at 510.

J.T. does not address the applicability of the *Flores* case. Instead, J.T. merely cites an assortment of excessive force cases involving police officers and asks me to perform my analysis with respect to "Zavala's Fourth Amendment Rights." Dkt. 20 at 17. None the cases provided by J.T. address the argument advanced by the Individual Defendants, and I have no clue who Zavala is! Based on my reading of *Flores*, J.T.'s excessive force claim under the Fourth Amendment must fail.

### 2. Fifth Amendment – Procedural Due Process

J.T. alleges that Defendants violated his procedural due process rights under the Fifth Amendment. Defendants move to dismiss this claim, arguing that the Fifth Amendment does not apply to state actors, such as school districts and their employees. Defendants are correct. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'" *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). The Fifth Circuit has held that "the Fifth Amendment applies only to the actions of the federal government, and not to the actions of a municipal government as in the present case." *Morin v. Caire*, 77 F.3d 116, 120 (5th

Cir. 1996).  Because J.T. has not alleged any federal government involvement, I find that

his Fifth Amendment claim must be dismissed in its entirety.  *See Landry v. Cypress*

*Fairbanks ISD*, No. 4:17-CV-3004, 2018 WL 3436971, at *5 (S.D. Tex. July 17, 2018)

(dismissing a Fifth Amendment claim against a school district and its employees).

### 3.      Fourteenth Amendment – Due Process

J.T. alleges that Defendants have violated his Fourteenth Amendment procedural

and substantive due process rights.  In setting forth the liberty interests that Defendants

have supposedly infringed upon, J.T. alleges:

> Defendants . . . threat of [in-school] suspension and then discipline of assault
> by coloring [his] scalp without notice and opportunity to be heard violated
> [his] due process rights and he suffered great mental anguish and pain and
> suffering.[12]

Dkt. 14 at 12.  Defendants move to dismiss this claim on two grounds.  First, Defendants

argue that the mere threat of in-school suspension does not constitute deprivation of a

liberty or property interest.  Next, Defendants argue that the claim based on the coloring of

---

[12] At oral argument, J.T. identified another purported interest that he believes Defendants have
infringed upon.  He argued that his right to an education as described in *Goss v. Lopez*, 419 U.S.
565 (1975) was infringed when he missed a single class period during the scalp coloring.  I have
reviewed *Goss* and find no support for the existence of a liberty or property interest consistent with
J.T.'s argument and the facts alleged in this case.  In *Goss*, the United States Supreme Court held
that students have a protected property interest in education that required minimum due process
protections before expulsion or suspension could be imposed.  *See id.* at 573–74.  As explained by
the Fifth Circuit, under *Goss*, "it is a student's '*total exclusion from the educational process* for
more than a trivial period' that constitutes a deprivation of protected property and liberty interests
subject to due process constraints."  *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 394 (5th
Cir. 2011) (quoting *Goss*, 419 U.S. at 576) (emphasis added).  In my view, the facts in this case
come nowhere close to an allegation of J.T.'s "total exclusion from the educational process," and
missing a single class clearly constitutes a "trivial period."  In other words, the liberty interest
described in *Goss* is simply inapplicable to this case.

his scalp must fail because J.T. has post-deprivation remedies available under Texas state law.  I will address each of Defendants' arguments in turn.

The Fourteenth Amendment Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  To state a due process claim, J.T. must "first identify a life, liberty, or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest."  *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995).

As mentioned above, Defendants first attack the notion that the threat of an in-school suspension affects any liberty or property interest.  In my research, I have come across a Fifth Circuit case that I find particularly instructive on this point.

In *Esparza v. Board of Trustees*, 182 F.3d 915 (5th Cir. 1999), the plaintiffs were students at a school with a new mandatory uniform policy.  For a time, the plaintiffs resisted the uniform policy by securing waivers.  *See id.*, at *1.  Eventually, the school district denied the plaintiffs' waivers and extended them a two-week grace period to secure uniforms.  *See id.*  At the end of the grace period, the plaintiffs had not obtained school uniforms.  *See id.*  As a result, the plaintiffs were subjected to the school district's four-step procedure for sanctioning students who failed to wear a uniform.  *See id.*  The four-step procedure provided:

> After each of the first two infractions, the student receives written warnings, his parents are notified, and he receives counseling.  After the third infraction, he is placed on in-school suspension for ten days.  After the fourth infraction, he is assigned to the alternative education placement . . . program, wherein he receives only the core courses necessary to earn the credits

> needed for graduation but may not participate in advanced placement courses, honors courses, or extracurricular activities.

*Id.* By the time the plaintiffs filed their lawsuit, most of them had received notices for their first two infractions and were concerned about the possibility of in-school suspension due to a third infraction. *See id.* For this reason, "[t]hey sought preliminary relief to block the in-school suspension that would stem from a third infraction." *Id.* In other words, the court considered more than a mere threat of in-school suspension; it considered a promise of an in-school suspension. *See id.*

The district court denied the plaintiffs' request for injunctive relief. *See id.* On appeal, in pertinent part, the plaintiffs asserted that the district court erred with respect to their due process claims because it "failed to consider the district's punishments for a third infraction: in-school suspension for ten days." *Id.*, at *4. The Fifth Circuit was not persuaded by this argument and held that the promise of an "in-school suspension for ten days" did "not constitute an unconstitutional deprivation of a property right." *Id.* In reaching this conclusion, the *Esparza* court explained:

> the plaintiffs are not being deprived of their access to public education, because they are not being excluded or suspended from attending classes. Rather, they are only being transferred from one school program to another program with stricter discipline.

*Id.* (internal quotation marks and citation omitted). The *Esparza* court went on to state that the in-school suspension was not "the type of action[] encroaching on property interests that the Supreme Court has stated may implicate due process concerns." *Id.* In the end, the Fifth Circuit "agree[d] with the district court that the plaintiffs have failed to demonstrate how the district's uniform policy deprives them of a constitutionally-protected

16

liberty or property interest," and therefore, "the plaintiffs do not meet the 'substantial likelihood of success' requirement needed to win injunctive relief." *Id.*, at *3.

Based on *Esparza*, I find that the mere threat of an in-school suspension does not constitute an unconstitutional deprivation of a liberty or property right. I now turn to Defendants argument concerning post-deprivation remedies.

In *Ingraham v. Wright*, the Supreme Court concluded that "corporal punishment in public schools implicates a constitutionally protected liberty interest," namely "freedom from bodily restraint and punishment," which is necessarily deprived when a school official corporally punishes a student. 430 U.S. 651, 672–74 (1977). "In procedural due process claims, however, what is unconstitutional is the deprivation of such an interest without due process of law." *Clayton ex rel. Hamilton v. Tate Cty. Sch. Dist.*, 560 F. App'x 293, 297 (5th Cir. 2014) (internal quotation marks, emphasis, and citation omitted). Thus, "there is no procedural due process violation when a corporally punished student is not given the opportunity to be heard pre-deprivation. Instead, . . . the availability, post-deprivation, of statelaw remedies satisfie[s] due process." *Id.* (citation omitted). Similarly, "school children have a liberty interest in their bodily integrity protected by the Due Process Clause of the Fourteenth Amendment, and . . . physical abuse by a school employee violates that right." *Arevalo-Rivas v. Austin Indep. Sch. Dist.*, No. A-15-CV-430-LY, 2015 WL 7161995, at *4 (W.D. Tex. Nov. 13, 2015) (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994)). "However, a student may not bring a substantive-due process claim for corporal punishment intended to discipline the student, even if the punishment was excessive, [if state law] provides adequate administrative remedies." *Washington ex*

17

*rel. J.W. v. Katy Indep. Sch. Dist.*, 390 F. Supp. 3d 822, 844 (S.D. Tex. 2019). Texas provides adequate administrative remedies for both procedural and substantive due process claims. *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 875 (5th Cir. 2000) (detailing criminal and civil remedies available under Texas law); *Washington,* 390 F. Supp. 3d at 844 (substantive due process claim); *Poloceno v. Dall. Indep. Sch. Dist.*, No. 3:18-CV-1284-S, 2019 WL 2568681, at *3 (N.D. Tex. June 21, 2019) ("Because post-deprivation remedies are available in Texas, the Court must dismiss Plaintiff's procedural due process claim.") (collecting authority).

***

Because the threat of in-school suspension does not implicate a liberty or property interest and Texas law provides J.T. with adequate administrative remedies for his Fourteenth Amendment due process claims, J.T.'s Fourteenth Amendment due process claims must be dismissed.[13]

### 4        Fourteenth Amendment – Equal Protection

J.T. also asserts an equal protection claim under the Fourteenth Amendment. He alleges that "Defendant[s] acted arbitrarily in their actions against [him] and treated him

---

[13] It is beyond dispute that the scalp coloring in this case constitutes corporal punishment. The Fifth Circuit has explained that "fairly characterizing an act as corporal punishment depends on whether the school official intended to discipline the student for the purpose of maintaining order or respect or to cause harm to the student for no legitimate pedagogical purpose." *Flores*, 116 F. App'x at 511. In this case, J.T. has plainly alleged that the coloring of his scalp took place in a pedagogical setting, as discipline for a dress code violation. This is sufficient to constitute corporal punishment. *See Washington*, 390 F. Supp. 3d at 844 ("[B]ecause 'the setting [was] pedagogical, and [the] student's action was unwarranted,' the teacher's actions were corporal punishment." (quoting *Marquez v. Garnett*, 567 F. App'x 214, 217 (5th Cir. 2014))).

differently than those with other hairstyles and similarly situated white students thereby violating [his] right to the equal protection of the laws." Dkt. 14 at 12. Defendants argue that this claim must be dismissed because J.T.'s allegation is impermissibly conclusory. Specifically, Defendants contend that J.T. failed to offer any specific factual support for his assertions that Defendants treated him differently than similarly situated white students.[14] I agree with Defendants.

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. To state an equal protection claim, a plaintiff typically alleges that he "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (internal quotation marks omitted). "Thus, no equal protection violation is alleged where a plaintiff 'fails to allege any facts showing that [others were] similarly situated.'" *Wilder v. Caliber Home Loans, Inc.*, No. 3:18-CV-3010-E-BN, 2020 WL 806961, at *12 (N.D. Tex. Jan. 29, 2020) (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 414 (5th Cir. 2015)). *See* also *Clark v. Owens*, 371 F. App'x 553, 554 (5th Cir. 2010) ("[C]onclusory assertions that [a plaintiff] was treated differently than other similarly situated [persons] are insufficient to state an equal protection claim."); *Kyles v. Garrett*, 222 F. App'x 427, 429 (5th Cir. 2007) (affirming dismissal of prisoner's equal protection claim because aside from conclusory "allegations that others similarly situated ha[d] been

---

[14] Defendants advance several other arguments against J.T.'s equal protection claim. Because I find the argument addressed above dispositive, I do not reach those other arguments.

granted parole . . . [he] offer[ed] no specific factual support for his assertions."); *Mpras v. D.C.*, 74 F. Supp. 3d 265, 271–72 (D.D.C. 2014) (rejecting as conclusory the complaint's allegation that the plaintiff was treated differently from those "similarly situated" where complaint did not allege any supporting facts "about who these other persons are or how they were similarly situated"); *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 244 (W.D.N.Y. 2012) (dismissing male student's equal protection claim for failure to state "facts identifying similarly-situated students or describing the treatment of female complainants by the defendants in like circumstances"); *Maryland Manor Assocs. v. City of Hous.*, 816 F. Supp. 2d 394, 405 (S.D. Tex. 2011) ("[C]ourts have routinely dismissed [equal protection] claims that merely allege the existence of other similarly situated individuals or entities and do not state any facts to support this claim.") (collecting cases).

Here, J.T. has cursorily alleged the existence of similarly situated white students, but he has not offered any facts specifically identifying such persons.  Nor has J.T. alleged any facts from which I could infer that the anonymous white students are similarly situated—i.e., facts demonstrating that Defendants punished white students differently for violating the dress code.  In the absence of such facts, J.T.'s allegations amount to nothing more than mere "labels and conclusions."  *Iqbal*, 129 S. Ct. at 1949.  Consequently, this claim must be dismissed.  *See Lozano v. Ortega*, No. EP-14-CV-239-KC, 2014 WL 6611595, at *8 (W.D. Tex. Nov. 19, 2014) (dismissing equal protection claim, in part, because plaintiff did not "allege facts indicating that he was treated differently from similarly situated suspects outside of his protected class").

### 5.      Title VI of the Civil Rights Act of 1964

Next, J.T. alleges that Pearland ISD violated Title VI by discriminating against him due to his race, which included treating him differently than white students.  *See* Dkt. 14 at 12 ("J.T. was discriminated against because of his [race], African American, and was not treated the same as white children.").  Pearland ISD argues this claim must be dismissed because J.T. has not alleged "facts necessary to permit the inference that [it] intentionally discriminated against J.T. due to his race."  Dkt. 19 at 27.  I agree with Pearland ISD.

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  "To prevail on a claim for relief under Title VI, a private litigant must prove: (1) that the defendant engaged in *intentional discrimination* based on race, color, or national origin; and (2) that the defendant received federal financial assistance."  *Pathria v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013).

To meet his pleading obligation, J.T.'s Title VI claim must set forth "specific allegations of acts that were taken with discriminatory intent."  *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (quotation marks and citation omitted).  To survive a motion to dismiss, the allegations must also create a reasonable inference that Pearland ISD's discriminatory conduct was motived by J.T.'s race.  *See Pathria*, 531 F. App'x at 455 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). Importantly, entities, such as Pearland ISD, cannot be held vicariously liable under Title

VI. *See Mohamed*, 252 F. Supp. 3d at 628 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285–88 (1998)).  Further, when a Title VI claim does not involve an official policy of intentional discrimination, a plaintiff must allege an "appropriate person—an official authorized to institute corrective measures—had actual knowledge of the discrimination and responded with deliberate indifference." *Id*. at 627 (citing *Gebser*, 524 U.S. at 290 (internal quotations omitted)).

In my view, the Amended Complaint wholly relies on the conduct of the Individual Defendants to demonstrate Pearland ISD's supposed discriminatory intent towards J.T. That is, J.T. points to the Individual Defendants' coloring of his scalp and threats of suspension.  This is fatal to J.T.'s claim because "[e]ven [if he] adequately alleged intentional discrimination based on race by [the Individual Defendants] or any other school administrator, an entity such as [Pearland ISD] cannot be held vicariously liable under Title VI." *Id*. at 628.  Thus, to the extent that J.T. bases his Title VI claim against Pearland ISD on a theory of vicarious liability for the Individual Defendants' actions, dismissal is required. *See Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (dismissing plaintiff's Title VI claim because the complaint "d[id] not contain a single allegation of discriminatory intent on the part of the institutional defendants").

Moreover, J.T. has not alleged that any "appropriate person" was aware of unlawful discrimination by the Individual Defendants or any other school administrator and responded with "deliberate indifference."  To be clear, at most, J.T. has alleged that his mother's and lawyer's attempts to contact Pearland ISD's Superintendent have been unsuccessful.  This does not amount to an allegation of deliberate indifference and certainly

22

does not demonstrate that the Superintendent had "actual knowledge" that J.T. had been subjected to any race discrimination.

In sum, J.T.'s Title VI race discrimination claim must be dismissed.

## D.   SECTION 1985 – CONSPIRACY

J.T. also alleges that Defendants discriminated against him because of his race and did "not treat [him] the same as white children." Dkt. 14 at 12. Based on this allegation, J.T. asserts a claim under 42 U.S.C. § 1985(3).[15] Defendants move to dismiss this claim, arguing that Pearland ISD and its employees, the Individual Defendants, constitute one legal entity and therefore cannot conspire with each other as a matter of law. I agree with Defendants.

"[T]o avoid dismissal of his Section 1985(3) conspiracy claims, [J.T.] must allege, among other things, a conspiracy of two or more persons." *Henry v. Pep Boys*, No. 4:13-CV-3042, 2017 WL 5646885, at *3 (S.D. Tex. Mar. 21, 2017) (internal quotation marks and citation omitted). Under the well-established intracorporate-conspiracy doctrine, "where all of the defendants are members of the same collective entity, no claim of conspiracy can be sustained against them." *LaFleur v. McClelland*, No. 4:13-CV-425, 2013 WL 5148181, at *3 (S.D. Tex. Sept. 11, 2013) (collecting cases). The Fifth Circuit has applied this rule to prevent plaintiffs from bringing conspiracy claims under § 1985(3)

---

[15] Although the Amended Complaint only alleges a general Section 1985 claim, § 1985(1) does not apply to state officials and § 1985(2) only addresses conspiracy to obstruct justice in judicial matters. *See* 42 U.S.C. § 1985; *Benningfield v. City of Hous.*, 157 F.3d 369, 378 (5th Cir. 1998). Because both scenarios clearly do not apply here, I assume that J.T. intended to bring a claim under § 1985(3) for conspiracy to deprive him of his constitutional rights.

against multiple defendants employed by the same governmental entity.  *See, e.g.*, *Benningfield*, 157 F.3d at 378; *Thornton v. Merchant*, 526 F. App'x 385, 388 (5th Cir. 2013).  *See also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867–68 (2017) (discussing application of the intracorporate-conspiracy doctrine to Section 1985 claims).  "Here, because the defendants are [Pearland ISD] and its employees, none of the defendants could have conspired with each other as a matter of law."[16]  *Gambrel*, 2019 WL 1057405, at *4.  Accordingly, J.T.'s claim under Section 1985 must be dismissed.

## E.   REMAINING ARGUMENTS

The Individual Defendants have also moved to dismiss J.T.'s constitutional and federal statutory claims based on qualified immunity.  Because, as explained above, I find

---

[16] There are exceptions to the intracorporate conspiracy doctrine, such as (1) "when the alleged conspirators have an independent stake in achieving the object of the conspiracy"; (2) "whe[n] the alleged conspirators are acting for their own personal purposes"; and (3) when the alleged conspirators "act outside the scope of their employment, their actions exceed the bounds of their authority, or they have engage [sic] in unauthorized acts."  *Collins v. Bauer*, No. 3:11-CV-00887-B, 2012 WL 443010, at *7–8 (N.D. Tex. Jan. 23, 2012).  In my view, the Amended Complaint does not contain any facts tending to show that any of the defendants had an independent stake in achieving the object of the purported conspiracy—i.e., racial animus against J.T.  This renders the first exception inapplicable.

The second exception, the "personal purposes" exception, fares no better.  To the extent that J.T. alleges Defendants racial animus constitutes their "personal purposes," this argument is unpersuasive.  As explained by one court:

> [R]acial animus is an element of a § 1985(3) claim.  Therefore, if racial animus qualified as a "personal purpose" under this exception, the intracorporate-conspiracy doctrine could not apply to § 1985(3) claims.  Because the Fifth Circuit has applied the intracorporate-conspiracy doctrine to § 1985(3) claims, racial animus cannot be a "personal purpose" under this exception.

*Gambrel v. Walker Cty.*, No. 4:18-CV-2868, 2019 WL 1057405, at *4 n.5 (S.D. Tex. Mar. 6, 2019).

Lastly, the sum of J.T.'s claim is that Defendants were all acting in the course and scope of their employment.  I see no allegation contained in the Amended Complaint implying otherwise.  Thus, the third exception is also inapplicable.

that J.T. has failed to state any federal claims against the Individual Defendants, I do not

reach the issue of qualified immunity.  *See Iqbal v. City of Pasadena*, No. CV H-19-3608,

2020 WL 411107, at \*6 n.2 (S.D. Tex. Jan. 24, 2020) ("Because the court finds that Iqbal

fails to state a due process claim, the court does not reach Defendants' arguments regarding

Pennington's qualified immunity."); *Jackson v. Pierre*, No. CV 18-603-SDD-RLB, 2019

WL 4739294, at \*8 n.91 (M.D. La. Sept. 27, 2019) ("The Court does not reach the issue of

Defendants' asserted defense of qualified immunity, because none of the federal claims

survive the motions to dismiss."); *Jackson v. Tex. S. Univ.*, 997 F. Supp. 2d 613, 650 (S.D.

Tex. 2014) ("Because Plaintiff has failed to state a claim[,] . . . the Court does not reach

the issue of qualified immunity.").

Pearland ISD has also moved to dismiss, arguing that J.T. has failed to plead facts

demonstrating its liability under *Monell v. Department of Social Services*, 436 U.S. 658

(1978) and its progeny.  Because I've already found that J.T. has failed to state any claim

against Pearland ISD, I do not reach the issue of *Monell* liability.  *See Bonner v. Hinds

Cty.*, No. 3:14CV488-FKB, 2016 WL 1260789, at \*3 (S.D. Miss. Mar. 30, 2016) ("[I]f the

Court finds that Plaintiff has failed to assert a violation of a constitutional right, it need not

reach the question of *Monell* liability.").

Lastly, in an abundance of caution, I address J.T.'s recent attempt to amend his

pleading.  J.T. requested that I permit him to amend his pleading to add a new party—

another African American student who allegedly had his scalp blackened for a similar

reason.  On January 27, 2020, I denied the request on the record during a pre-motion

conference.  In J.T.'s view, the addition of this new party would go towards demonstrating

a pattern or practice under *Monell*. *See* Dkt. 33. As explained above, I have not reached the question of *Monell* liability because I have found that J.T. failed to state a claim. Thus, even if I allowed J.T. to amend his complaint, it would not change my ruling.

## CONCLUSION

Every day, across America, parents entrust school administrators and educators with their precious and irreplaceable children. In doing so, most parents recognize that mistakes can and will happen in the educational setting; they recognize that no adult can shield a child from every harm emanating from other children at school; and they reasonably expect, hope, and believe that, at a minimum, school officials will do no harm to their children. In this case, Pearland ISD school officials did harm. They remedied a minor dress code violation by coloring a minor's scalp with a permanent marker containing toxic chemicals, causing the minor to become his peers' subject of ridicule and jest. None of this should have occurred. Pearland ISD school officials should have known better. And, in the future, I hope they will do better.

That said, my role in this case is not to assess whether Pearland ISD school officials have upheld their end of the social contract with parents. My role is to determine whether the Amended Complaint is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "Justice Scalia once said that he wished all federal judges were given a stamp that read 'stupid but constitutional.' As he was implying, not everything that is undesirable, annoying, or even harmful amounts to a violation of the law, much less a constitutional problem. Today's case provides another illustration of that fact." *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 714 (7th Cir. 2016) (citation omitted).

26

***

For the reasons explained above, I **RECOMMEND** that Defendants' Motions to Dismiss (Dkts. 16–19) be **GRANTED in part and DENIED in part**.

Specifically, Trice and Washington, in their individual capacities, should be dismissed for lack of standing. All of J.T.'s federal claims under 42 U.S.C. § 1983—Fourth Amendment (excessive force), Fifth Amendment (due process), Fourteenth Amendment (due process and equal protection), Title VI of the Civil Rights Act of 1964—and race discrimination under Section 1985 should be dismissed. And, Pearland ISD should be dismissed.

In the interest of clarity, only J.T.'s state law assault claim against the Individual Defendants should survive this recommendation. And, Trice and Washington should remain as plaintiffs only in their representative capacities as J.T.'s parents.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 16th day of March, 2020.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE